CASE 2—PETITION EQUITY—DECEMBER 24, 1864.

# Trustees Caldwell Institute vs. Young, &c.

### APPEAL FROM BOYLE CIRCUIT COURT.

1. The act of 1839 (*Sess. Acts*, 93) gives to mechanics, material men, &c., a lien only on the interest which the *employer* may have in the premises or buildings. (12 *B. Mon.*, 90.)

2. The mechanic's lien commences with the work, and continues to enlarge, *pari passu*, with its progress, and no intervening lien or incumbrance can break its continuity or curtail its extent. (1 *B. Mon.*, 257.)

3. Under the fifth section of the act, registration of the claimant's demand within six months after completion of his work or materials furnished, or suit within that period to assert his claim, is necessary to secure the lien given by the act.

4. No contract can be absolutely and immediately effectual unless the subject-matter of it be actually existing, or proximately potential as the natural fruit of something that does exist. *(1 *B. Mon.*, 257.)

JUDGE ROBERTSON DELIVERED THE OPINION OF THE COURT:

The trustees of the Caldwell Female Institute, chartered for female education on a large scale in Danville, had bought about six acres of ground in that town, and had *partially* completed a large four-story edifice for fulfilling the benevolent purpose of the charter, when, on the 29th of December, 1859, they made a written agreement with A. E. Sloan, containing substantially the following stipulations, together with some others not now material:

1. That Sloan should be the moral superintendent and literary principal of the institute, and be entitled to all the pecuniary profits.

2. That as a more capacious and magnificent structure was deemed by him, with their concurrence, needful for a "first-class school," he might erect a large additional building, with other appurtenant houses, in the rear of the house to be finished by them, and might furnish and equip the whole in his own way.

3. That he should be entitled to the use of the grounds and all the improvements, "rent free," for fifteen years.

4. That, to aid him in fulfilling his contract, they would loan him, at an interest not exceeding ten per cent., the sum of $10,000, payable in five years.

5. That, at the close of the term of fifteen years, they would pay him one third of the costs of his improvements, which third should not exceed $10,000.

6. That they should "have a lien on the building he should erect," and also on "the furniture and fixtures" he should supply to the whole establishment.

Early in the succeeding spring Sloan commenced the erection of a very large "ell," to be attached to the front building then finished by the trustees; and in November, 1860, he had finished that addition, also four stories high, equipped it with elaborate apparatus for supplying it with water, gas, and

heat, and furnished it in an expensive and elegant style, all costing over $30,000.

Most of the mechanics and material men, who, under contracts with him, had contributed to these improvements, claiming statutory liens on the entire edifice, front and rear, filed in the Boyle circuit court petitions for enforcing their claims by a sale of the property. Some few of them had also helped to erect the front building.

The circuit judge decided that *all the buildings* were subject to the claims of all the petitioners who had filed their accounts and asserted liens in the manner and within the time prescribed by the mechanics' lien law of 1839, and that their liens were superior to all other incumbrances.

This appeal is from that decree.

In revising the case, this court will consider only two general questions—1. Do appellees hold legal liens, and if so, to what extent? and, 2. Are those liens paramount to any or all other incumbrances?

1. The first section of an act of 1839 (*Sess. Acts*, 93), which was, by a subsequent statute, applied to Danville, provides that mechanics, who shall do work on any house, and material men, who shall furnish materials for its construction or repair, shall have liens for their respective claims to compensation on "the interest of their employers in the ground and the house so built or repaired; and, to make any such initial lien available, the fifth section requires the claimant to file an account of his claim, and an assertion of his lien, in the county court office, within six months after the completion of the building or repairing, *or after finishing work on it or furnishing materials therefor.*" So far as that has been done in this case, the claimants have valid liens on the interest of the employer. The employer may have an appreciable interest in a house without being the owner of it, and the lien operates on that interest and not on that of the owner, unless the employment was at the instance of the latter and on his credit. But when it was at the request and on the credit alone of any other employer, his interest alone is sub-

ject to the lien; and this, as the statute literally imports, and has been judicially construed to intend, is the "employer" contemplated by the first section. (*Fetter, &c., vs. Wilson, &c.,* 12 *B. Mon.,* 90.)

It is not denied that the trustees, as owners, were the employers in the building of the front house, and the lien of their employees applied to their interest in that house. But Sloan, and not the corporation, seems to have been the employer in the erection and completion of the "ell" and its appurtenances. These immense enlargements and their equipments were evidently assented to by the trustees on his recommendation and for his immediate advantage, and were expected, probably, to be, for fifteen years, and perhaps much longer, more beneficial to him than to them; and for a valuable consideration, *paid* to him by the corporation, he had undertaken to accomplish the whole of that job. He made no contract with any mechanics or material men in any other than his own individual capacity and name, nor apparently on the credit or responsibility of the institution. And it would be unreasonable to presume that the trustees, after paying him for the entire work, and binding him to do it on his own credit, or with his own means, thus or otherwise obtained, could have intended to be liable for any portion of the costs. Nor is there any proof that any of the employees considered *them* the employers, or looked to *them* for payment, except for contributions to the front building; and even if they did, the delusion was their own fault; they might have ascertained the true state of the case. It was their duty to know it, and, therefore, they must be presumed to have known it. (*Same case, p.* 92.)

We feel bound, therefore, to hold, that, in the construction and equipment of the "ell" and its appurtenances, Sloan was actually the employer, and, *legally*, the only one. The liens of the petitioners, who contributed to those improvements, are, therefore, confined to Sloan's interest. That interest, consisting, as it does, of his lease for fifteen years, and his $10,000, to be paid by the trustees at the end of that term, is

appreciable and vendible. It is certainly of considerable value, ascertainable by a proximate calculation; and it is vendible, because the purchaser could not change the destination to which the use of the building has been dedicated, and would only have a right to the rents which Sloan, if he should continue to occupy it in his present capacity, or his successor in the same capacity, would have to pay to the new landlord. By this only rightful effect of the sale, the control and curation of the trustees could not be qualified or disturbed, nor would the institution itself be necessarily or probably *jeopardied*. The only necessary or probable effect would be a curtailment of Mr. Sloan's profits, by having to pay for his occupancy instead of enjoying it, as now, free from rent; and the reduction of his fortune, also, to the extent of $10,-000, for the ultimate payment of which he holds a resulting lien on the improvements which he made, *and which to his employees passed by an equitable subrogation, coeval and coextensive with their liens.*

We may add, on this subject of the liens of the mechanics, that they commenced with the commencement of their work, continued to enlarge *pari passu* with its progress, and were made fully effectual from their inception to their consummation by registration within six months, and no intervening incumbrance could break their continuity or curtail their extent. Any other construction of the beneficent statute, enacted for the encouragement and security of building mechanics, might frustrate its object and make it a mockery. They undertake to work, as in this case, on the faith of the plighted lien for the entire job; and shall they have either to quit work or go on without the security of a lien for what they might do after the interposition of a stranger's intermediate purchase or incumbrance? This, in our judgment, is not so, and ought not to be so, as virtually adjudged in the case of Nazareth Institute vs. Lowe and wife (1 *B. Mon.*, 257).

The liens of the contributors to the rear improvement extend to and include Sloan's interest, also, in the front

building, because, for any work of construction or reparation of any part of an entire building, the law reserves a lien on the employer's interest in the entire house, and the front and rear buildings of the "*Caldwell Institute*" are one, and but one, entire edifice. But the liens of the contributors to the front building do not extend to Sloan's subsequently acquired interest in the entirety. They attach to the interest of the trustees in that part of the entire structure which they contributed to complete, the trustees being so far their employers, and this, then, being the only building; and of this last class are the suppliers of the apparatus for lighting, warming, and watering the front building.

In the contract of 1859 with Sloan, the trustees agreed to finish that building according to the diagram furnished by *Dwight*. That plan exhibits provisions for supplying that building with gas fixtures, radiators, and water sinks. Sloan did not, by his contract, undertake to do that portion of the work. As to light, heat, and water, his undertaking was, that, in addition to the erection of the rear building, he would warm and light that building, and do all other things necessary to equip and carry on a first-rate school. He did superintend and direct the work for supplying the front building with water, heat, and light, and had it done in a different style from that contemplated in *Dwight's* plan; but though in a different mode only, still the same ends were effectuated which the trustees agreed with him that they would accomplish. We are, therefore, of the opinion that, in respect to this job, the trustees should be considered the employers, through the intermediation of Sloan, and as consenting to the substitution of his form of fixtures for those which they agreed to supply.

We construe the statute to mean, as to filing the account of each claimant of a lien, that the amount claimed is all that is contemplated; and that, when a note had been given for it, the filing of *it* would comply with the requisition; and as to the time of filing, we understand the statute as requiring each claimant to file his demand within six months after his job of work had been finished, or his materials fully furnished.

The fifth section of the statute prescribes two modes of securing the liens of mechanics and material men—registration, or, still asserting the lien, the *lis pendens* may be equivalent to the registration, if, like that, the suit be brought within the same prescribed period; but in each form of procedure alike, the statutory lien is waived by failure to proceed within that time.

We need not decide whether the lease by the trustees to Sloan attached to the front house before it was finished, and thus became a house, because it appears to us that their reserved lien did not include his interest in that house. The reservation is in these words: " The said trustees are to have a lien on the buildings *to be erected* by said Sloan." This means a lien on his interest in those buildings; and we do not feel authorized to expand the clear literal import of the language so as to include any other house than those erected by Sloan, and that is *only* the ell and its appurtenances. We must conclude that their lien does not apply to the front house built solely by themselves.

The petitioners, Russels, did the brick work of all the buildings, front and rear. Their lien for their work on the front house, done under the employment of the trustees, is attached to that house; and their lien for their work on the rear buildings, done under Sloan's employment, must be confined to his interest under his contract with the trustees in 1859, extending to the whole house; and for the gas, heating, and water-fixtures, attached under the employment of the trustees of the front building, the lien operates on their interest in that building.

2. The extraneous and competing liens are—1. That claimed by the trustees under their contract with Sloan in December, 1859, as already described; 2. A mortgage by Sloan to the institute, dated 25th October, 1860, covering his interest in all the buildings, furniture, and fixtures, as a security of the $10,000 loaned to him as before mentioned; 3. A mortgage by the institute to Welsh, Beatly, and Meyers, dated January 3d, 1861, for securing $2,900; and, 4. A mortgage by the institute to Caldwell and others, dated 11th of March, 1861.

As to these two last mortgages—third and fourth—it is sufficient to say, that, being posterior to the liens for work and materials on houses furnished in November, 1860, they cannot interfere with any of them.

The same objection applies to the second mortgage, dated 25th October, 1860. Those liens for work and materials were then, probably, full and complete; and even if they were not altogether so, they could not be disturbed by any such interloping incumbrance.

Moreover, that mortgage was never asserted in the pleadings, nor was it, nor could it, have been made for the purpose of enforcement. It may have been admissible as evidence of the advance of $10,000 promised as a loan. It was, probably, read for that single purpose; for, not being litigated, it was not competent evidence for any other purpose. Nor is the lien reserved by the contract of 1859, on Sloan's lease of the buildings he undertook to erect, available against the mechanics and material men whose work and materials built them. No contract can be absolutely and immediately effectual, unless the subject-matter of it be actually existing, or proximately potential as the natural fruit of something that does then exist. The utmost effectuality of such a barren contract for not even the shadow of any existing substance, is, that it may be conditional, but cannot attach to the contingent thing unless, or until, it shall actually exist. Therefore, the lease on which this lien was reserved did not attach to the buildings until they had been erected. When they were completed they were incumbered with inherent liens, relating back to the commencement of the work; and, consequently, when the lessee's right first attached to them, it was attached to them as they then were, and he took them *cum onore*.

The lien reserved in the lease followed it, and could not operate on the buildings sooner or otherwise than the lease did.

The principle here suggested is, we think, established by Pothier and Chitty, and other elementary writers on contracts; and we are much mistaken if it be not more authoritatively established in the case hereinbefore cited of Nazareth vs.

Lowe and wife. In that case this court decided that Mrs. Lowe's right to dower in a house built by her first husband, Kelly, during their coverture, was not paramount to the liens of the mechanics and material men who contributed to its erection. After deciding that her initiate right was subject to the lien of the vendor to her husband of the lot on which the house was built, this court said: "Nor have we any doubt that her title to dower in the dwelling-house is equally subject to the legal liens of the mechanics and material men. Her claim to dower in the house could not have been initiated before there was any house or part of a house; and the lien given by the statute would be unavailing and illusory unless it commenced with the commencement of the building, and progressed with the progress of the execution, *pari passu*. The lien was inherent in and coextensive with the work and materials. Every part of the work was done, and every material was furnished subject to the lien. Kelly never had any right to the house, or to any part of it, unincumbered by the statutory lien, How, then, could his wife, whose right was consequential merely, have ever had a better and broader interest in the house than the husband himself had?"

The conclusion seems to be logical and legal, that neither the corporation nor *Sloan* had any vendible interest in unbuilt houses; and that their titles were not even initiated until there were buildings in which they could vest; and that then they were incumbered by legal liens which could not be squeezed out or dislocated by their subordinate claims. This conclusion harmonizes with the policy of the statute and the proper liberality of its construction; and, in our judgment, it harmonizes no less with fairness and justice.

But whether it might be thought to have been graceful or ungraceful, fair or unfair, in the trustees to take a lien on their own houses before they had been built, and thereby try to forestall the statutory lien of the builders, and leave them without reward or security for it, this court decides that no such means can effect such an end any more than a bankrupt's sale of a house before it was built could deprive the laboring builders of the statutory security, on the faith of

which they toiled and furnished materials in the construction of it.

We are, therefore, of the opinion that the properly registered liens of the mechanics and material men in this case are prior and superior to all other incumbrances on Sloan's interest in the houses, by whomsoever built, of the *Caldwell Institute*.

As the foregoing opinion differs essentially from that of the circuit court, its judgment is reversed, and the cause remanded for such a judgment as to all the various parties as herein indicated as proper and rightful.